THE STATE, TO USE OF MORRISON'S ADMINISTRATOR, Respondent, v. ST. GEMME'S ADMINISTRATOR, Appellant.

1. Under the fifth section of the act concerning marriage contracts, approved December 22, 1824, (R. C. 1825, p. 526) all contracts of marriage, as well those entered into before as after the passage of the act, had to be recorded in the county where the property to be affected was situate, in order to be of any binding effect, except as between the parties thereto and such as had actual notice thereof.

2. Marriage contracts entered into before Louisiana became a part of the United States, were within the purview of said marriage act, and had to be recorded in order to be binding upon strangers. (19 Mo. 446, affirmed.)

3. The fact that one of the parties to a marriage contract died before the passage of said act of 1824, does not dispense with the obligation to place the contract upon record to give it any binding effect as against third persons.

4. An omission to record such contracts did not affect its binding force upon the parties thereto, while it might deprive them of many of its intended benefits.

5. If it should be admitted that under the Spanish law a gratuitous gift of some slaves to one of the parties to a marriage contract subsequent to the marriage would not become community property, yet it would nevertheless be carried into such community by the following provisions in the marriage contract: that the parties "take each other with the goods and rights to *each belonging at present and hereafter acquired,* which goods and rights shall be common between them, no matter what sum they may amount to, or in what place the same may be."

6. A *preciput* which by the terms of a marriage contract was to be paid at the division of the community goods can not take effect where there is nothing to be divided; nor, where a division may be had, will it be paid to the injury of creditors, if the contract has not been recorded.

The State, to use of Morrison's Adm'r, v. St. Gemme's Adm'r.

7. A provision in the contract giving dowry to the wife, and conferring on her the right of renouncing the community and taking back every thing she brought into it, will have no effect as against creditors unless it has been recorded.

8. Where a county court has jurisdiction of the subject matter, and its judgment is only erroneous, such judgment can not be overturned in a collateral proceeding.

9. The provisions in the territorial laws, January 21, 1815 (Terr. Laws, vol. 1, p. 418), relating to the assignment of dower and the carrying out of marriage contracts, were omitted in the revision of 1825.

10. In the revision of 1825, the only provision for setting apart the widow's dower in slaves was contained in the sixty-fifth section of the administration act, relating to distribution. (R. C. 1825, p. ——.)

11. And where an order of distribution was made by the county court in 1828, under said sixty-fifth section, without first giving notice to those interested in the estate; *held,* to be *coram non judice,* and void.

12. Where a widow becomes administratrix of her husband's estate, and while officiating as such certain slaves belonging to said estate are set apart and assigned to her as her separate property under a void and irregular order of the county court, in pursuance of which she converts them to her own use; *held,* that the statute of limitations did not run in her favor against a claim for such conversion, while she continued administratrix. (State, to use of Menard, v. Pratte & St. Gemme, referred to.)

## Appeal from Ste. Genevieve Circuit Court.

This was an action brought in 1853 by the State, to the use of Conrad C. Zeigler, administrator of William Morrison, against Eloy Lecompte, administrator of Maria Theresa St. Gemme and her securities, upon her administration bond. It is alleged in the petition that Vital St. Gemme, the husband of said Maria, died in 1824 indebted to William Morrison; that in 1829 judgment on said debt, in the sum of $2,277.85, was recovered against the said Maria, who became the administratrix of said St. Gemme, and that said judgment was allowed against her decedent's estate in 1830; that said Vital St. Gemme was possessed at his death of valuble estates in chattels and slaves, which came to the hands of said Maria as administratrix; that said Maria had assets sufficient to liquidate all debts of the estate; but that she wasted and converted to her own use nine slaves of said estate, of the value of $4,000, and died without paying this claim of plaintiff's; that said slaves came into the hands of

her administrator, Lecompte, who sold them and now holds the proceeds.

The answer denies the alleged conversion, and sets out as a defence that three of the said slaves were allowed to said Maria by order of the county court in 1828 as a jointure of $450, to which she was entitled under her marriage contract with St. Gemme, dated 1798, she being at liberty according to its terms to take money or property. As to the other six, they never were the property of St. Gemme, but were given to said Maria by her father, and, under the law in operation then, they became her absolute property; and that the county court, in 1828, by order, allowed her to retain them as such. The statute of limitations is also set up as a bar.

Part of the facts of the case appear in an agreed statement, which includes the marriage contract, dated February 11, 1798. The following extracts of it may be cited as bearing upon the merits of the case: "The said future husband and wife shall have a community of all goods, movable, acquired, and immovable, according to the usage and custom of the place; according to which custom and usage the said community of goods shall be governed: notwithstanding that they shall hereafter change their residence to some other place, the laws, usages and customs of which should be different or conflicting, they having by these presents expressly renounced and abandoned any rights under the said different or conflicting laws."

" The said future husband and wife take each other with the goods and rights to each belonging at present and hereafter acquired; which goods and rights shall be common between them, no matter what sum they may amount to, or in what place the same may be. In consideration of this marriage, the said future husband has endowed and does endow the said future wife with the sum of fifteen hundred *livres* fixed dowry, to be taken so soon as the marriage shall take place, of the goods movable and immovable, in present or future possession of the said future husband, who has encum-

bered hypothecated the same for the purpose of raising and levying the said dower, of which the said future wife shall become seized, and shall enjoy the same, according to the custom of the place, without being compelled to sue for the same before a court of justice." "The survivor of said husband and wife shall take by *preciput*, and before making a distribution of the community effects, the sum of seven hundred and fifty *livres* from among the movable goods of the said community at the inventory and appraisement prices, or the said amount in cash, at his or her option. The said future wife and the children which may be born of the said marriage shall be permitted, if they choose, to renounce the community, to take back again whatever she may have brought into the community, and all that she may subsequently have brought into the same, in movable or immovable goods, whether derived from inheritance, gifts, legacies, or other sources ; and (moreover) even the said future wife may, if she survive, take the dower and *preciput* aforesaid, all free from liability, for community debts and mortgages, although she should have contracted them verbally, in writing, or by judgment, for which, if it should so happen, the children aforesaid shall be paid and indemnified by the heirs ; and out of the goods of the said future husband, which are for this and all other parties of this contract pledged or hypothecated from the day," "they hereby mutually, simply, and irrevocably give to each other and the survivor of them, accepting the same, each for his or her heirs and assigns, all and every the goods and chattels, effects and properties, real or personal, now in possession or hereafter acquired, which may belong to one of them who shall die first: provided, nevertheless, that there shall be no issue living or to be born of the said marriage ; for in that case the said mutual gift shall become null and void."

This contract was never recorded. There was in evidence an order of the county court, dated 1828, setting aside six slaves to said Maria, property which came to her by gift of her father ; also an order of the county court of the same

date allowing her three negroes as jointure, which she chose under the contract.

The court, in its verdict, found that the slaves were given to Maria and her husband, and were not the separate property of Maria, free from the contracts of her husband ; that said Maria converted the slaves to her own use ; that Morrison's debt was a community debt. The court also declared as conclusions of law that the said slaves, at the time of the death of said Vital St. Gemme, were subject to the payment of his debts contracted after marriage ; that said slaves were not the paraphernalia property of said Maria ; that her failure to account for the property so converted was a breach of the bond ; that the claim of plaintiff was not barred by the statute of limitations. Judgment of $5,332 was entered up by the court on this finding, from which an appeal has been taken.

*Frissell*, for appellants.

I. This court have often refused to disturb an order of judgment of a county court, where it had jurisdiction of the subject matter, although its decisions had been erroneous. Under the laws of 1828, the county court had jurisdiction of the subject matter, and all necessary parties were before them. The judgment will not be disturbed unless the proof of fraud is clear and conclusive, made under proper allegations in the petition. It is conceded to the plaintiff that the marriage contract, never having been deposited in the Spanish archives or recorded in any county, can not affect the rights of the plaintiff unless he had notice of its existence ; and although there was no proof offered of such notice, it was the universal custom of the country at that time to have such contracts, and there was no reason to presume an exception in respect to the parties in question. But if there was no contract, or an invalid one, the law made one for them, and established a community of goods. (9 Mart. 217.) Property acquired by either party during marriage, whether by inheritance or donation, became separate prop-

erty. (1 La. 522.) The same was true of property con-
veyed to the husband in lieu of a sum of money inherited
by the wife. Property which enters into community is not
governed by the law in force at the time of the dissolution,
but by that in force at the time of the marriage. (4 La.
191.) Paraphernal property would be protected by the
treaty of cession which guaranties to the inhabitants of
Louisiana the quiet enjoyment of their property. (8 U. S.
Statutes, p. 202.) The order of the county court in assign-
ing the three slaves to Maria St. Gemme as a dower, al-
though erroneously made, still, in the absence of fraud,
ought to protect her administrator. The fact that the slaves
were inventoried as the property of Vital St. Gemme should
not be allowed much weight when we reflect upon the igno-
rance of law that must have belonged to those who probably
made the inventory. This claim of plaintiff is barred by the
statute of limitations.

*Noell,* for respondents.

I. There are but two or three points in this controversy.
1. Were the slaves in question the paraphernal property of
Maria St. Gemme, and did the action of the county court, in
1828, confer any right upon her to appropriate them? 2.
Does the statute of limitations apply to this case, and does it
afford the defendant any protection? 3. Is there any error
committed by the court in fixing the value of the property
converted? Upon the first point, we maintain that under the
Spanish law property was " paraphernal" only in cases where
the property was given to the *separate use of the wife.* That
the fact that the wife brings it in, or the husband brings it
in, does not affect the question as to whether the property is
or is not paraphernal, unless in addition to that fact it fur-
ther appears that the property given is limited to the sepa-
rate use of the wife. In other words, it can not enter the
community and at the same time be paraphernal. If in the
case at bar the slaves entered the community, then they
were liable to the community debts. (White's New Recopi-

lacion, p. 55, 56, vol. 1.) The contract in this case has no effect upon the question as to whether the slaves were or were not paraphernal, or were or were not community property. (20 Mo. 122.) The statute of limitations is no bar to this suit. (23 Mo. 344.) The agreed statement of facts includes the value of the slaves.

SCOTT, Judge, delivered the opinion of the court.

The fifth section of this act concerning marriage contracts, approved December 22, 1824, (R. C. 1825, p. 526,) directs that all marriage contracts heretofore entered into may be recorded in like manner as contracts hereafter entered into ; and from the time of recording the same shall (as to all property affected thereby within the county in which it is recorded) impart full and perfect notice to all persons of the contents thereof, and no such marriage contract, which shall not be recorded within six months after the taking effect of this act, shall be valid or binding, or in anywise affect any property, real or personal, (except between the parties thereto and such as have actual notice thereof,) until the same shall be deposited with the recorder of the county wherein such property is situated for record. The marriage contract between Maria T. St. Gemme and her husband was made on the 11th day of February, 1798, before Louisiana became a part of the United States ; yet the case of Wilkinson v. Rozier, 19 Mo. 446, held that such a contract was within the purview of the act of 1824, and, in order to affect strangers to it, that it must be recorded. St. Gemme died during the year 1824. The administration bond executed by his wife M. T. St. Gemme as administratrix, was dated the 10th May, 1824. Her death, then, occurred before the act of 22d December, 1824, was passed : but that circumstance did not dispense with the obligation to place the contract upon the record ; for whatever the effect of the failure to record the instrument might have had on the rights of St. Gemme, if any, yet, as Mrs. St. Gemme was a party to the contract and had a right under it, for the protection of those rights it was

necessary to record it. The contract was binding between the parties, though not recorded; the statute declares it so. If the contract, though unrecorded, is binding on the wife, how then will it be with paraphernal property, which, by the contract, was subjected to the community? In consideration of stipulations favorable to her, she placed in the community property which otherwise would not have gone into it. By the' contract the slaves entered into the community. The effect, then, of not recording the contract is, that the wife loses her property and the consideration she was to receive for it. She loses her dowry or avers the benefit of the renunciation of the community, and retaking the property placed in community freed from the payment of debts. Thus while the contract operates against her, she can derive no benefit from it against third persons claiming without notice.

We have said that the slaves given by her father to M. T. Gemme entered into the community. The contract, as translated in the record, stipulates that the parties " take each other with the goods and rights to each belonging at present and hereafter acquired, (*échu ou a échoir*,) which goods and rights shall be common between them, (*lesquels entreront en communauté*,) no matter what sum they may amount to, or in what place the same may be." The words " belonging at present or hereafter acquired" do not properly express the meaning of the words " *échu ou a échoir*." The dictionary of the French Academy says the word " *échoir se dit ordinairement des choses qui dévolues par le sort, ou qui arrivent par cas fortuit*." The clause of the contract which confers on the wife and children the right to renounce the community shows the sense in which this word is used, and what modes of coming into the possession of property it embraces. The clause of the contract cited is sufficiently comprehensive in its terms to place in the community all donations made to the wife during its continuance. Granting that the deed of 1810, executed by her father, was ineffectual to convey the slaves mentioned in it to St. Gemme, that they passed by the gift immediately following the marriage, and that by

16—VOL. XXXI.

the Spanish law property coming to the wife during the marriage by a gratuitous title would not enter into the community but be paraphernal; yet, as to this matter, the parties by their contract could vary the law and place property in the community which otherwise would not have gone into it, and as this was done by the terms of the contract, the slaves became subject to the law of community, and were liable for the debts contracted by the husband during its continuance.

The *preciput* was by the terms of the contract to be paid at the division of the goods of the community, and as there was nothing to be divided, it could not be paid. Besides, as the contract was not recorded, it could not have been paid to the injury of creditors even had it been made a preferred debt.

The clauses of the contract giving dowry to the wife and conferring on her the right of renouncing the community and taking back every thing she brought into it, must fail of effect against a creditor by reason of the omission to record the marriage contract.

We do not see any ground on which the conduct of the county court in adjudging the widow her dowry under the marriage and paying the *preciput* can be sustained. We concede that if the county court had jurisdiction of the subject matter and its judgments were only erroneous, they could not be overturned in a collateral proceeding. But we can see no authority in the law for the course adopted. The act of January 21, 1815, § 74, 75, (Terr. Laws, vol. 1, p. 418,) directed how a widow should proceed to obtain her dower in slaves and lands. The seventy-seventh section of the same act provides that the same proceedings that are hereinbefore prescribed with respect to dower shall be had for the purpose of carrying into effect the marriage contracts that may have heretofore been made or shall hereafter be made in pursuance to any laws, usages and customs now or hereafter in force in this territory. The sections referred to show that a widow, in order to obtain her dowry in slaves, or to carry into effect any marriage contract, a regular suit

was required; a petition was to be filed in the circuit court; a summons was issued, and a service was required on the person or persons against whom she complained.

The foregoing provision in the territorial laws for the assignment of dower and the carrying into effect marriage contracts were omitted in the revision of 1825, and by the code of that date dower in slaves was no longer assigned to the widow as was her dower in her lands. The only provision for setting apart the widow's dower in slaves was embraced in the section of the administration law relating to distribution. (§ 65.) But the distribution there directed could not be made without notice to those interested. In executing the marriage contract in September, 1828, the county court acted under the code of 1825, which contained no provision sanctioning the conduct; the act therefore was *coram non judice,* and void.

This is an action on the administration bond of Mrs. St. Gemme. On a former occasion, when this case was here, (8 Mo. 287,) it was held that an action on the bond was not barred. The present action was commenced within a year from the discontinuance of the former one. This suit, then, is not barred by the statute of limitations. But it is maintained that Mrs. St. Gemme held the slaves adversely from the year 1828, when the county court carried into effect the marriage contract between her and her husband; consequently, that the slaves were converted at that time, and she is only liable for the value of them at that date. But Mrs. St. Gemme, when the county court assigned the slaves to her, was the administratrix of her husband's estate; if the slaves were taken and held adversely from that time, it was her duty as administratrix to sue for and recover them. No other person could sue. How, then, could she, in her own right as claimant, hold adversely to herself as administratrix? The slaves were required for the payment of debts. None but the creditors of the estate had an interest in them, and the creditors could only be represented by the administratrix. If, at the time the slaves were assigned to her, she

resigned her letters and another administrator had been appointed, there might be some semblance of right in this pretension ; but under the circumstances we do not see how it can be maintained.

The other judges concur.